THOMAS M. ARTHUR and FRANK J. BOYLE,
TRADING AS ARTHUR & BOYLE, USE OF FIELDER
C. SLINGLUFF AND STUART S.
JANNEY, TRUSTEES,

*vs.*

MORROW BROTHERS,
GARNISHEES OF JAMES G. PARLETT.

*Fraudulent conveyances: releases of debts; rights of creditors;
by attachment or bill in equity.*

A release can have no effect upon obligations not covered by
the contract to which it refers.                              p. 67

In an action against garnishees, where they do not themselves
take the stand, there is a presumption raised against them. p. 67

Ordinarily, the test of liability of a garnishee is whether he
had any property, funds or credits in his hands for which the
debtor might sue him.                                         p. 67

But the rule does not apply, where a debtor fraudulently con-
veys property to another; in such a case, the grantee may be
charged as garnishee.                                      pp. 67-68

A voluntary conveyance is *prima facie* invalid as against ex-
isting creditors of the grantor who has no sufficient means to pay
his debts, independent of the property conveyed, and that with-
out regard to his intent and that of the grantee.            p. 68

The burden of proof is on the party claiming under the
conveyance to prove that the grantee had sufficient property to
pay his debts, exclusive of the property conveyed.           p. 68

If the necessary effect and operation of such an instrument be to hinder, delay or defraud creditors, the legal presumption is that the conveyance was made for that purpose, and it is void under the Statute of Elizabeth.                    pp. 68-69

Such a principle is applicable to releases of debts.        p. 69

In the case of a debt fraudulently and without consideration released to a garnishee, it was: *Held,* that the creditors could proceed either by attachment or by a bill in equity.   ·    p. 69

*Decided June 28th, 1917.*

Appeal from the Superior Court of Baltimore City. (STANTON, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Albert R. Stuart* and *Stuart S. Janney* (with *Ritchie & Janney, A. Dana Hodgdon* and *Fielder C. Slingluff* on the brief), for the appellants,

*Carville D. Benson* and *John D. Nock,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

The appellees were the general contractors for the State Normal School Building, near Towson, and made in writing a sub-contract with James G. Parlett to do certain work in connection with its construction. The contract is not in the record, but a memorandum of agreement filed in the case shows that it was for grading and landscaping. Parlett made a sub-contract with Carozza Brothers & Company, who in turn entered into a sub-contract with Arthur & Boyle, the appellants.

While that work was going on, Charles Morrow, one of the appellees, called Frank J. Boyle, one of the appellants, to where he and Parlett were standing and asked him if he would make some tunnels which were to be constructed under the building, and he replied that he would if he got his price, and that he could start the next morning.  After some conversation about the price, Morrow turned to Parlett and said: "Parlett, get them in right away, and also said to me you had better get your shovel up there and get to work on them and get them out as we can't start this building until these tunnels are taken out.  Q. And he said to Mr. Parlett, you get them out right away?  A. Yes."  That is substantially all in the record in reference to the contract for the tunnels, but it is corroborated by Parlett.

The appellants did the work and received a payment of $1,890 on account of it.  Frank J. Boyle testified that the amount was paid to him by Parlett, who received the money from Morrow Brothers, at their office, in his presence and turned it over to him.  Later the appellants sued the appellees for the balance they claimed to be due on account of the work on the tunnels, but the case was decided against them. Afterwards they sued Parlett and recovered a judgment against him for $4,409.05, with interest and costs.  On that judgment an attachment was issued, and laid in the hands of Morrow Brothers.  They first filed a plea of *nulla bona,* but subsequently filed an additional plea in which they admitted having $250 in hand due Parlett, but alleged that they had no other goods, chattels or credits of Parlett in their hands. The $250.00 was for the balance due on the contract for grading and landscaping.  The trial in this case resulted in the appellants obtaining a verdict for only $250 against Morrow Brothers, the garnishees, and they appealed from the judgment thereon.

There are only two bills of exception in the record—the first being to the admission of an "Agreement and Release," a "Memorandum of Agreement" and a receipt which were offered by the garnishees, and the second presents the rulings

on the prayers. The plaintiffs offered five prayers, all of which were rejected, and the garnishees offered three, the second of which was granted, and the others rejected. We do not find in the record a copy of the judgment on which the attachment was issued, but the evidence of Mr. Boyle shows that they recovered judgment for $4,409.05, with interest from May 9, 1916, and apparently that was the date of the judgment. Nor is there anything to show when the suit against Parlett was instituted. The appellees rely on the agreement and release referred to, while the theory of the appellants is that Morrow Brothers owe Parlett a balance for the work on the tunnels, which they claim is the amount of the judgment they recovered against Parlett, and (1) that Parlett never did release this claim, and (2) that even if he did, the release was without consideration, void and of no effect as to them, by reason of the *British Statute,* 13 Elizabeth, Chapter 5, known as the *Statute Against Fraudulent Conveyances,* in force in this State.

(1) We find no error in admitting the papers referred to, notwithstanding our conclusion to be hereinafter stated as to the effect of the release. The memorandum of agreement was dated March 16, 1916, and was executed by Morrow Brothers, parties of the first part, James G. Parlett, party of the second part, and Carozza Brothers & Co., parties of the third part—the individual members of the two firms being also named. Its recitals are as follows:

"Whereas, the parties of the first part entered into a contract with the party of the second part *for the grading and landscaping* (italics ours) at the Maryland State Normal School, and the parties of the third part claim to have an assignment of said contract from the party of the second part; and whereas, a dispute has arisen in regard to the state of accounts between them, and the parties hereto have arrived at a compromise settlement of their differences. Wherefore, now this agreement witnesseth, that in consideration of the sum of one ($1.00) dollar, by each of the parties hereto to the other paid, and in further considera-

tion of certain mutual concessions by the parties here-
to, it is agreed by the parties hereto and each of them,
that the total amount due by the parties of the first
part, in connection with, and as a result of the *mat-
ters and things hereinbefore referred to* (italics ours),
is eleven thousand, five hundred dollars ($11,500), and
no more."

On the same day what is called an "Agreement and Re-
lease" was executed by Parlett, party of the first part, and
the Carozza Brothers & Co., parties of the second part, to the
Morrow Brothers, parties of the third part, the individual
members of the firms being also named. It recites that

"Whereas certain differences and disputes have arisen
between * * * (naming the parties) regarding certain
contracts entered into by the parties of the first and
third parts regarding certain work to be done at and
on the Maryland State Normal School, for the erection
of which school the parties of the third part were the
general contractors; and whereas said differences and
disputes have been adjusted to the satisfaction of the
parties hereto,"

and that for and in consideration of the sum of $10,500 in
hand paid to the parties of the first and second parts by the
parties of the third part, the receipt of which is acknowl-
edged, and the further payment of $1000 when the State of
Maryland makes final payment to Morrow Brothers, and of
other good and valuable considerations, Partlett and Carozza
Brothers & Co. and each of them, remise, release and for-
ever discharge Morrow Brothers

"from all and all manner of action and actions, cause
and causes of action, suits, debts, dues, sums of money,
accounts, reckonings, bonds, covenants, contracts, agree-
ments, promises, damages, claims and demands whatso-
ever in law or in equity, which against the said Wil-
liam H. Morrow and Charles A. Morrow, or either of
them, they ever had, now have or which their respective

heirs, personal representatives or assigns, hereafter
can, shall or may have for, upon or by reason of any
manner or cause, or thing whatsoever, from the begin-
ning of the world to the day of the date of these pres-
ents. The said parties of the first and second parts,
and each of them, hereby declaring themselves fully
paid and satisfied.

"And the said parties of the first and second parts
do hereby covenant and warrant that any and all
claims of any other sub-contractors or other persons
for labor and material done, or furnished, in, about or
in connection with the construction of the State Nor-
mal school, in Baltimore County, or in or about the
site of said State Normal School Building, are paid in
full, and that they and each of them will assume and
pay any and all such claims as may arise or be pre-
sented."

The receipt referred to is as follows:

"Baltimore, 3/16/1916.

Received of Morrow Brothers two thousand dollars
in full settlement of Normal School contract, except
the sum of $1,000, which is to be paid when work is
finally completed and accepted, to be paid as follows:
Parlett, $250.00; Carozza, $750.00."

That is signed by Parlett and Carozza Brothers. It would
be difficult to use more words in a release than in the one
above set out, but there are some significant facts which can
not be overlooked. In the first place it would have been so
easy to mention the contract for tunneling, if that was in-
tended. Then the "Memorandum of Agreement" and the
"Agreement and Release" were executed the same day, and
the former specifically refers to the contract for *grading and
landscaping* and to no other contract. It can not be con-
tended that *it* relates to that for tunneling. It is there agreed
"that the total amount due by the parties of the first part
(Morrow Brothers), in connection with, and as a result of

the matters and things hereinbefore referred to, is eleven thousand five hundred ($11,500) dollars, and no more." The only things "hereinbefore referred to" are the grading and landscaping. The $11,500 is the precise sum named as the consideration in the agreement and release, there being $10,500 in hand paid, and the sum of $1000 to be paid when the State made its final payment. It is, therefore, affirmatively and clearly shown that no part of the $11,500 was paid for the tunneling, but that the whole of that sum was due by Morrow Brothers to Parlett and Carozza Brothers Company for grading and tunneling.

But beyond that, it is stated in the opinion of the learned judge below, and we so understand from the record, that the contract for the grading and landscaping was made between the Morrow Brothers, who were the general contractors, and Parlett—then Parlett made a sub-contract with Carozza Brothers & Co. for that work, which, according to the Memorandum of Agreement, the latter claim amounted to an assignment of it, and that firm made a sub-contract with Arthur & Boyle for that work. We find nothing in the record to suggest that the Carozza Company had any interest whatever in the contract for tunneling. It was, therefore, proper to join the Carozza Company in the Memorandum of Agreement and for them to unite in the Release, and to require that company and Parlett to discharge Morrow Brothers from all claims they were jointly interested in or connected with, but why should it have been intended by that instrument to release Morrow Brothers from a claim of Parlett with which the Carozza Company had no connection? If it had been so intended, the natural and proper thing to do was to specifically recited in the release the claim for tunneling, as the Carozza Company had nothing to do with it, but were parties to the release. It is clear that the release was only intended to affect the contract or contracts with which Parlett and the Carozza Brothers and Company were both connected, and not one to which the latter were in no wise parties.

Then when we come to the oral evidence, which was admitted without objection so far as the record discloses, and we think properly admitted under the issues, it is altogether on the one side.  Neither of the Morrows testified, nor did they call a witness, notwithstanding Parlett had sworn that the tunnel work was not included, and not intended to be included.  As the record stands, Morrow Brothers have only paid $1,890 for "sixty some hundred dollars" of work, without an iota of evidence to contradict that statement by Parlett, and if the appellees' construction of the release is correct, they were released from the payment of over four thousand dollars without one penny's consideration, for, as we have shown, the consideration named in the release is exactly what all of the parties agreed under seal was due for the grading and landscaping.

But that is not all.  Morrow Brothers not only knew that Arthur and Boyle were doing the tunneling, but according to the uncontradicted evidence Charles Morrow told Parlett in Boyle's presence, to get them to work right away and Parlett gave them a written order to do the work, which work it is not denied they did.  The $1,890 which they did pay was paid to Parlett in Boyle's presence, and then turned over to him in Morrow Brothers' office.  Parlett was criticized at the argument for making in this case statements contradictory to and inconsistent with his evidence in the suit which Arthur and Boyle brought against Morrow Brothers for the balance due for the tunneling work, but it can not properly be said that his explanation is an unreasonable one. He testified in the other case that the money was due to Arthur and Boyle and not to him, and he said at this trial that he then thought it did.  They did the work, and under the facts about their employment shown by the record he might well have believed that they were entitled to the money. As Arthur and Boyle did the work, if their charges for it amounted to all that Morrow Brothers were to pay for it, the proper thing for Parlett to do was to treat it as their money.

and not his. When the Court determined that Arthur and Boyle could not recover from Morrow Brothers and that Parlett was responsible to them, he then very properly concluded that the money was due him. It certainly was not intended by the Court, or any one else, that it should not be paid to someone. It was due either to Arthur and Boyle directly, or to Parlett for their benefit. He admits that he made a memorandum in his book of the amount, and sent Morrow Brothers a notice of it, but he says that his idea was that he was to collect it and pay it to Arthur and Boyle. As he had given the written order to Arthur and Boyle to proceed with the work, it was perfectly proper for him to make and keep a memorandum of it, but the only money that has been paid, he paid over at once to Arthur and Boyle in the presence of Mr. Morrow. The fact that neither of the Morrows went on the stand is significant and raises a presumption against them. *Dawson* v. *Waltemeyer,* 91 Md. 328. Their claim that they are released from the sum due is simply based on the fact that the release is under seal, and not even on a contention that they have paid the money. We are, therefore, of the opinion that under the evidence the release did not apply to the contract for tunneling, and hence the fact that it was under seal can make no difference.

That being so, no reason appears from the record why Parlett can not sue Morrow Brothers, and there can be no application of the general principle referred to in the opinion of the lower Court, and in the authorities cited by the appellees—that ordinarily the test of the liability of a garnishee is whether he had property, funds or credits in his hands for which the debtor can sue him. That general principle is clearly and thoroughly established by 2 *Poe on Pt. & Pr.,* Sec. 531; *B. & O. R. R. Co.* v. *Wheeler,* 18 Md. 372; *Myer* v. *Ins. Co.,* 40 Md. 595, and very many other authorities which could be cited, if there was any doubt about it. But there are well recognized exceptions to the general rule —one of which is that if a creditor has fraudulently con-

veyed property to another, the grantee may be charged as garnishee. *Odend'hal* v. *Devlin,* 48 Md. 439; *Farley* v. *Colver,* 113 Md. 379, 386; *Hodge & McLane on Attachments,* sec. 148. If he has conveyed it contrary to the *Statute of Elizabeth* it comes within the exception.

But if the release had included this fund, then it would have been null and void and of no effect as against the appellants, or other creditors of Parlett. He testified that he had no means with which to pay this judgment, and it was in effect conceded at the argument that he was insolvent. If a debtor and creditor can discharge an indebtedness simply by having the creditor execute an instrument like this under seal and the creditor has no other means with which he can pay his debts, then indeed might it be properly charged that the law encourages fraud and protects fraudulent transactions, instead of protecting honest and innocent people from attempts to defraud them. We do not mean to say that there was intentional fraud in this matter, but if it was intended to get rid of this indebtedness for no sufficient consideration and thereby put it beyond the reach of the creditors of Parlett, it was certainly what the law condemns. Parlett swears positively that it was not intended to release this claim; the Morrows are silent. The *Statute of 13th Elizabeth,* Chapter 5, has frequently been before this Court. A voluntary conveyance is *prima facie* invalid as against existing creditors of the grantor who has no sufficient means to pay his debts, independent of that conveyed, without regard to his actual intent or to that of the grantee. *Christopher* v. *Christopher,* 64 Md. 583, 588; *Cone* v. *Cross,* 72 Md. 102, 105. The burden is on the party claiming under the conveyance to prove that a debtor had sufficient property with which to pay his debts, exclusively of that conveyed away. It is not necessary in order to bring a conveyance within the statute that there shall be an actual intent on the part of the grantee to perpetrate a fraud. If the necessary effect and operation be to hinder, delay or defraud creditors, the legal presumption

is that it was made for that purpose. *Schuman* v. *Peddicord,* 50 Md. 560, 563; *Riley* v. *Carter,* 76 Md. 581, 600; 1 *Alex. Br. Stat.* (*Coe's Ed.*), 507, note 21. If the release had its origin in fraud, or what the law deems fraud, it would make no difference that it was under seal. *Schaferman* v. *O'Brien,* 28 Md. 565, 575; *Young* v. *Trustee of Public Schools,* 31 N. J. Eq. 290.

The statute is applicable to release of debts. *Bigelow on Fraud,* Con. 132; *May on Fraudulent and Voluntary Dis. of Prop.* (3rd Ed.), 20-21, 15-16; *Moore on Fraud. Con.,* 60, sec. 19; *Hauser* v. *King,* 76 Va. 731, 737; 12 *R. C. L.* 507, sec. 36; 20 *Cyc.* 354, 406.

It follows from what we have said that there was error in granting the garnishee's second prayer and rejecting the plaintiffs' prayers. In this State the practice has been and is to permit a creditor to resort in such cases to either of two remedies, that of attachment or by bill in equity. *Stockbridge* v. *Fahnestock,* 87 Md. 127, 136, and cases there cited, and hence we have not thought it necessary to refer to the jurisdiction of a law Court, as it is well established.

> *Judgment reversed, and new trial awarded, the appellees to pay the costs above and below.*